[660 NYS2d 440]

Robert Porr, on Behalf of Himself and All Others Similarly Situated, Respondent-Appellant, v NYNEX Corporation et al., Appellants-Respondents.

Second Department, July 7, 1997

## APPEARANCES OF COUNSEL

*Davis Polk & Wardwell,* New York City *(Guy Miller Struve* and *David B. Anders* of counsel), and *John E. Reilly* and *Richard H. Wagner,* New York City, for appellants-respondents. (One brief filed.)

*Sheldon V. Burman, P. C.,* New York City *(James B. Fishman* and *G. Oliver Koppell* of counsel), for respondent-appellant.

## OPINION OF THE COURT

FRIEDMANN, J.

The plaintiff is a NYNEX customer and ratepayer in Westchester County who purports to represent both himself and

others similarly situated. The plaintiff charges that the defendants "secretly" and "fraudulently" followed "a policy of charging for phone calls in whole-minute increments only". For example, if a phone call lasts for two minutes and one second, the defendants charge for a full three minutes. It is the plaintiff's position that the defendants failed to state this policy plainly in their rate schedules filed with the Public Service Commission as required by Public Service Law § 92 (1), and that they had further not revealed the practice to the public in their billing statements.

Based upon these allegations, the plaintiff sued the defendants, NYNEX Corporation and New York Telephone Company, alleging eight causes of action sounding in: (1) unfair and deceptive practices under General Business Law § 349, (2) false advertising under General Business Law § 350, (3) violation of Public Service Law § 92 (1) and § 93, (4) fraudulent omission of material facts, (5) common-law fraud, (6) breach of a duty of good faith and fair dealing, (7) unjust enrichment, and (8) negligent misrepresentation. The plaintiff sought, *inter alia,* class certification, compensatory and punitive damages, and an injunction "[e]njoining defendant NYNEX from continuing to use the challenged deceptive, fraudulent and illegal practices" in the future.

The defendants moved pursuant to CPLR 3211 (a) (1) and (7) to dismiss the action, arguing that the plaintiff's claims were barred by the Public Service Law, by the "filed rate doctrine", and/or by the doctrine of primary jurisdiction. The defendants also argued that the plaintiff failed to state causes of action under General Business Law §§ 349 and 350, and failed to assert essential elements of his fraud claims.

The Supreme Court dismissed the plaintiff's Public Service Law and negligent misrepresentation claims with prejudice, and it dismissed the plaintiff's fraud and breach of duty of good-faith causes of action with leave to replead—although such leave had not been requested by the plaintiff. It declined, however, to dismiss the causes of action under General Business Law §§ 349 and 350, as well as the plaintiff's cause of action to recover damages for unjust enrichment, finding dispositive its perception that "[t]he essence of the instant lawsuit * * * is not 'rate making', or the reasonableness or alleged excessiveness of a given rate, issues which are clearly within the exclusive purview of the Public Service Commission * * *

Rather, the gravamen of plaintiff's instant claim is one sounding in fraudulent advertising, a claim which does not implicate the reasonableness of the filed rate. Therefore, the filed rate doctrine, as well as the doctrines of primary and exclusive jurisdiction would not seem to apply in the instant case". *(Porr v NYNEX Corp.,* 170 Misc 2d 203, 204-205.)

█ In this the court erred. For the reasons stated below, we hold that the filed rate doctrine, coupled with the related doctrine of "primary administrative jurisdiction", mandates the dismissal with prejudice of all of the plaintiff's causes of action.

# I

It has repeatedly been held that a consumer's claim, however disguised, seeking relief for an injury allegedly caused by the payment of a rate on file with a regulatory commission, is viewed as an attack upon the rate approved by the regulatory commission. All such claims are barred by the "filed rate doctrine".

In 1922 Justice Brandeis formulated the filed rate doctrine in *Keogh v Chicago & Northwestern Ry. Co.* (260 US 156). In that case, the plaintiff, a Minnesota manufacturer and shipper of excelsior and flax tow, established that the defendant railroads had collusively maintained artificially high freight rates in violation of the Sherman Act. The plaintiff argued that he was entitled to the difference between these collusive rates and the rates as subsequently adjusted by the Interstate Commerce Commission in response to his complaint. Justice Brandeis did not agree. According to him, the earlier, collusive rates, like the later, lowered ones, were nondiscriminatory and had been deemed "reasonable" by the Commission at the time that they were filed *(Keogh v Chicago & Northwestern Ry. Co., supra,* at 161). Even assuming that the Government could prosecute the defendants for antitrust violations, Justice Brandeis reasoned, it did not follow that a private shipper could recover damages because, in the shipper's estimation, he had for many years "lost the benefit of rates still lower, which, but for the conspiracy, he would have enjoyed" *(Keogh v Chicago & Northwestern Ry. Co., supra,* at 162).

Justice Brandeis adduced many grounds for holding that a consumer plaintiff has no cause of action, and no genuine claim for damages against a member of a regulated industry, when he has paid the rates filed with the regulatory commission.

For example, he explained, a lawsuit for damages may not be maintained in the absence of injury, and "[i]njury implies

violation of a legal right. [However, t]he legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier" *(Keogh v Chicago & Northwestern Ry. Co., supra,* at 163). Therefore, even if the carrier arrived at its rates illegally—by means of fraud or collusion or a conspiracy in restraint of trade—once the rates have been accepted as reasonable and applied uniformly by the regulatory commission, a shipper may not claim that he has been damaged if he has paid the filed rates. Indeed, any claim of "damage" would be "purely speculative" *(Keogh v Chicago & Northwestern Ry. Co., supra,* at 164-165).

Were this not so, Justice Brandeis amplified, a discriminatory system would result, with those having recourse to the courts paying less for the same services than other ratepayers who have either not sued, or who, having sued, are granted less substantial relief by different courts and juries *(Keogh v Chicago & Northwestern Ry. Co., supra,* at 163). Moreover, neither a court nor the Commission was equipped to answer the hypothetical question raised by the plaintiff in such a case, namely, whether a lower rate could legally (i.e., without causing discrimination) have been maintained during the period complained of "without reconstituting the whole rate structure", in order to determine "whether a hypothetical lower rate would under conceivable conditions have been discriminatory" *(Keogh v Chicago & Northwestern Ry. Co., supra,* at 164). Arguably, in order to find for the plaintiff in such an action, the Commission would have to second-guess itself—that is, it would have to conclude that the rates it had set in the past as *non*discriminatory were in fact discriminatory.

Although *Keogh* addressed *Federal* regulation, the cases considering the matter have held that the same rationales are implicated where, as here, a *State* regulatory agency sets an industry's "reasonable rates" *(see, e.g., H.J. Inc. v Northwestern Bell Tel. Co.,* 954 F2d 485, 494, *cert denied* 504 US 957 ["we see no reason to distinguish between rates promulgated by state and federal agencies. We are persuaded that the rationale underlying the filed rate doctrine applies whether the rate in question is approved by a federal or state agency"]; *Taffet v Southern Co.,* 967 F2d 1483, 1494, *cert denied* 506 US 1021 ["Where the legislature has conferred power upon an adminis-

trative agency to determine the reasonableness of a rate, the ratepayer 'can claim no rate as a legal right that is other than the filed rate * * * ' (citation omitted) This principle, which is central to the filed rate doctrine and to our decision today, applies with equal force to preclude recovery under RICO whether the rate at issue has been set by a state ratemaking authority or a federal one"]; *see also, Arkansas La. Gas Co. v Hall,* 453 US 571).

Intrastate telephone communications in New York are regulated by the Public Service Commission (hereinafter PSC) pursuant to the Public Service Law, which embodies "a comprehensive regulatory scheme for public utilities" operating within the State *(Abraham v New York Tel. Co.,* 85 Misc 2d 677, 680; *see also, Diamond Intl. Corp. v Federal Communications Commn.,* 627 F2d 489, 492). Characterized as "the alter ego of the Legislature" *(Matter of Rochester Gas & Elec. Corp. v Public Serv. Commn.,* 135 AD2d 4, 7), the Commission has "exclusive original jurisdiction over public utility rates" *(Van Dussen-Storto Motor Inn v Rochester Tel. Corp.,* 42 AD2d 400, 403, *affd on opn below* 34 NY2d 904, 906).

The "primary jurisdiction" of the PSC was definitively explored in the 1935 case of *Purcell v New York Cent. R. R. Co.* (268 NY 164). In *Purcell,* the plaintiff brick company had complained to the Public Service Commission in 1924 that the defendant railroad's shipping rates were unreasonable. When, in 1932, the Commission at length agreed and lowered "the price thereafter to be charged", the plaintiff sued to recover the difference that he had paid over the intervening years between the new and the old rates *(Purcell v New York Cent. R. R. Co., supra,* at 169). In dismissing the plaintiff's complaint, the Court ruled:

"When the railroad filed its tariff schedules as required by section 28 of the Public Service Law, these were the lawful charges to be paid by the brick company for its shipments of brick. The shipper could not legally pay less, the railroad company could not charge more or less. These were the rates fixed according to the statute until modified as therein provided. A subsequent change, although delayed, did not make the prior charges illegal or unreasonable. The statute creating the Public Service Commission and empowering it to supervise rates and charges was intended to cover the whole subject of rates and supersede all common law remedies. As long as the charges enforced are those on file with the Commission, they are the only lawful charges which may be collected. No departure from the filed rates is permitted.

"The Legislature has provided a means for the protection of shippers against unreasonable rates. The action at law resulted in different rates for different shippers dependent upon the opinion of juries as to what was reasonable. The statute makes the specified rate as fixed uniform and lawful until changed by or with the permission of the Commission.

"We, therefore, hold that the remedy provided by our Public Service Law for excessive rate charges is the only relief open to the plaintiff under the circumstances here set forth" *(Purcell v New York Cent. R. R. Co., supra,* at 171-172).

Central to the *Purcell* holding was the Court's observation that an administrative agency may set uniform "just and reasonable" rates for the present and the future, but that it is not empowered by its enabling statute "to decide what the reasonable charges should *have* been * * * during *past* years" *(Purcell v New York Cent. R. R. Co., supra,* at 169 [emphasis supplied]; *cf., Keogh v Chicago & Northwestern Ry. Co.,* 260 US 156, 164, *supra; see also, Matter of National Fuel Gas Distrib. Corp. v Public Serv. Commn.,* 97 AD2d 674, 675; *Matter of Consumer Protection Bd. v Public Serv. Commn.,* 85 AD2d 321, 324; *Matter of Niagara Mohawk Power Corp. v Public Serv. Commn.,* 54 AD2d 255, 257).

*Purcell* and the principles it stands for are still good law in the State of New York *(see, e.g., Minihane v Weissman,* 226 AD2d 152; *Lotto v Long Is. Light. Co.,* 58 AD2d 431, 434, *affd* 45 NY2d 978; *American Motorists Ins. Co. v New York Seven-Up Bottling Co.,* 18 AD2d 36, *affd* 13 NY2d 1157).

## II

As Judge Kimba Wood has pointed out in *Wegoland, Ltd. v NYNEX Corp.* (806 F Supp 1112, 1114-1115, *affd* 27 F3d 17), the filed rate doctrine is supported by two distinct, albeit related, policy "strands".

That is, some cases appear to be primarily "driven" by the court's desire to obviate the possibility of *discrimination.* For example, in *Maislin Indus. v Primary Steel* (497 US 116), the plaintiff shipper sought to pay less than the filed rate, based upon the fact that he had privately negotiated a specific lower rate with the defendant carrier. However, citing the traditional prohibition against price discrimination, the Supreme Court held that the filed rate *alone* governed the legal rights of the shipper against the carrier, and that the shipper's obligation to pay the filed rate could not be altered by contract, by equitable considerations, by the shipper's ignorance, or by the carrier's

misquotation of rates *(see also, Arkansas La. Gas Co. v Hall,* 453 US 571, *supra* [buyer of natural gas could not be forced to pay higher than filed rate, even though it had agreed to do so in its contract with the supplier]; *Louisville & Nashville R. R. v Maxwell,* 237 US 94, 97 [passenger who had bought a train ticket at a misquoted rate had no defense to payment of the filed tariff]; *Armour Packing Co. v United States,* 209 US 56, 81 [even a customer who has negotiated with the carrier for a lower rate must pay the filed rate]).

By contrast, another line of cases focuses on *"justiciability" (Wegoland, Ltd. v NYNEX Corp., supra,* 806 F Supp, at 1115). In the typical instance, the court is asked to determine a lower rate by assessing how much the defendants have inflated the rate through their alleged wrongdoing *(see, e.g., Square D Co. v Niagara Frontier Tariff Bur.,* 476 US 409; *Montana-Dakota Co. v Public Serv. Co.,* 341 US 246; *Keogh v Chicago & Northwestern Ry. Co., supra).* The analysis characteristically includes discussions of the expertise of the regulatory commission to address rate-making issues, the courts' lack of competence to assess a "reasonable" rate under all of the circumstances that the administrative agency has the knowledge and experience to analyze, and the havoc that would result should the courts subvert the authority of the rate-setting bodies and undermine the regulatory scheme promulgated by the Legislature *(see, e.g., Sun City Taxpayers' Assn. v Citizens Utils. Co.,* 45 F3d 58, cert denied 514 US 1064; *Minihane v Weissman,* 226 AD2d 152, *supra).*

### III

■ As the foregoing authorities make clear, there is no general "fraud exception" to the filed rate doctrine *(see, e.g., Wegoland, Ltd. v NYNEX Corp.,* 806 F Supp 1112, *affd* 27 F3d 17, *supra; see also, Marco Supply Co. v AT & T Communications,* 875 F2d 434, 436; *Missouri Pac. R. R. Co. v Rutledge Oil Co.,* 669 F2d 557, 558-559; *Consolidated Freightways Corp. v Terry Tuck, Inc.,* 612 F2d 465, 466, *cert denied* 447 US 907; *Aero Trucking v Regal Tube Co.,* 594 F2d 619, 622; *Illinois Cent. Gulf R. R. Co. v Golden Triangle Wholesale Gas Co.,* 586 F2d 588, 592).

The occasional anomalous cases appearing to suggest otherwise seem to be in error.

For example, the suggestion in *Nordlicht v New York Tel. Co.* (617 F Supp 220 [SD NY], *affd* 799 F2d 859, *cert denied* 479 US 1055), that a regulated defendant may be liable in damages

to a consumer if it "fraudulently induces a plaintiff to pay a filed rate or which otherwise exacts payment by fraud", is pure dictum, as the court ultimately dismissed the plaintiff's fraud claims as inadequately pleaded *(Nordlicht v New York Tel. Co., supra,* at 227).

The Eleventh Circuit in *Taffet v Southern Co.* (930 F2d 847) originally allowed consumers to sue a public utility for fraudulently maintaining inordinately high rates. However, the same court, sitting en banc, later reversed itself, ruling that the filed rate doctrine applied to bar consumer suits seeking reimbursement of any part of a filed rate, even when the regulated entity had defrauded the administrative agency into approving the artificially high charge *(see, Taffet v Southern Co.,* 967 F2d 1483, *supra).* This holding brought the Eleventh Circuit into line with the reasoning of the Supreme Court *(e.g., Keogh v Chicago & Northwestern Ry. Co.,* 260 US 156, *supra; Montana-Dakota Co. v Public Serv. Co.,* 341 US 246, *supra; Square D Co. v Niagara Frontier Tariff Bur.,* 476 US 409, *supra),* the Eighth Circuit *(H.J. Inc. v Northwestern Bell Tel. Co.,* 954 F2d 485, *supra),* and the Second Circuit *(Wegoland, Ltd. v NYNEX Corp.,* 806 F Supp 1112, *affd* 27 F3d 17, *supra).*

In *Gelb v American Tel. & Tel. Co.* (813 F Supp 1022), the court permitted the consumer plaintiff to maintain his causes of action under the Racketeer Influenced and Corrupt Organizations Act (18 USC § 1961), alleging that the defendant telephone company had fraudulently misrepresented the costs of using a much-advertised calling card. However, it reserved decision on whether money damages were collectible, "in light of the Court's view that the filed rate doctrine may prohibit retroactive rate setting as part of the remedy" *(Gelb v American Tel. & Tel. Co., supra,* at 1032). As *Gelb* ultimately settled, the question was never resolved *(see, Marcus v AT & T Corp.,* 938 F Supp 1158, 1171).

## IV

In the instant case, the alleged fraud was perpetrated directly on the consumer, rather than indirectly, by means of an intermediate fraud perpetrated on the administrative agency, as in *Keogh, Montana-Dakota,* and *Wegoland.* The question then becomes whether there is a sufficient difference between the two types of fraud to warrant creating an exception to the filed rate doctrine when the fraud is perpetrated directly on the consumer.

We find the distinction to be one without a difference. "As long as the carrier has charged and the plaintiff has paid the

filed rate, what bars a claim is not the harm alleged, but the impact of the remedy sought. Any remedy that requires a refund of a portion of the filed rate—whether an award of damages for fraud on an agency or an award of damages for fraud on consumers—is barred" *(Marcus v AT & T Corp., supra,* at 1170).

*Marcus* dealt with the essentially identical claim that certain consumers had been damaged by AT&T's allegedly fraudulent concealment of its practice of billing for residential long distance service by rounding up to the next full minute. In dismissing all of the plaintiffs' causes of action, the *Marcus* court pointed out that not only did the plaintiffs' claims violate the letter of the filed rate doctrine as embodied in guiding Supreme Court case law and other sound precedent, but that they ran afoul of the doctrine's underlying policy concerns as well *(Marcus v AT & T Corp., supra,* 938 F Supp, at 1171).

Similarly here, if the plaintiff were allowed to collect damages because of his purported reliance upon NYNEX's nondisclosure, he would have won for himself a reduced rate for his local telephone service. Nonparty subscribers to the same service would of necessity pay a higher rate. Such a "discriminatory" result cannot be squared with the filed rate doctrine's mandate of equal rates for equal service *(see, e.g., Marcus v AT & T Corp., supra,* at 1171).

In addition, as the *Marcus* court also noted, the very elements of some of the claims could compel discrimination. For example, common-law fraud and negligent misrepresentation require proof of reliance; and in a class action, the reliance of each class member must be proved *(see, e.g., In re Crazy Eddie Sec. Litig.,* 802 F Supp 804, 811-812). Class members able to prove reliance on NYNEX's alleged concealment of its "rounding up" policy would recover damages, while those unable to do so, either because they were aware of the filed tariff or because, for example, they were able to deduce the practice from the fact that they were billed for only full minutes, could not recover. The resulting disparity would thwart the PSC's goal of maintaining uniform Statewide rates *(Marcus v AT & T Corp., supra,* at 1171).

To permit this action to continue would also violate "the important concerns of agency authority, justiciability, and institutional competence" *(Wegoland, Ltd. v NYNEX Corp.,* 27 F3d 17, 22, *supra; Marcus v AT & T Corp., supra,* at 1171). The State Legislature has charged the PSC with the task of ensuring that NYNEX's rates are just and reasonable in light of,

*inter alia,* its costs *(see, e.g., Matter of Niagara Mohawk Power Corp. v Public Serv. Commn.,* 69 NY2d 365). The agency is uniquely equipped with the resources, experience, and expertise to make these assessments. The courts are not. "If courts were licensed to enter this process under the guise of ferreting out fraud in the rate-making process, they would unduly subvert the regulating agencies' authority and thereby undermine the stability of the system. For only by determining what would be a reasonable rate absent the fraud could a court determine the extent of the damages. And it is this judicial determination of a reasonable rate that the filed rate doctrine forbids" *(Wegoland, Ltd. v NYNEX Corp., supra,* 27 F3d, at 21).

█ The foregoing analysis is not changed even if we accept the plaintiff's argument that the "fraud" at issue here is not in the rate setting but in the alleged "concealment" of the defendants' "rounding up" practice, because the court would still have to compute the measure of the plaintiff's damages as the difference between "the rate previously deemed reasonable" and the "rate [that] would have been deemed reasonable absent the fraudulent acts" *(Wegoland, Ltd. v NYNEX Corp., supra,* 806 F Supp, at 1121). Moreover, at the heart of the plaintiff's grievance is the suggestion that he was entitled to be billed "per second". However, not only has the PSC authorized the defendants' "rounding up" practice, but its Federal counterpart, the Federal Communications Commission (hereinafter the FCC), in similarly sanctioning "per minute" billing, has determined that "per second" billing would *not* reduce consumers' telephone charges.

As has been pointed out, were lawsuits like this one to be countenanced, consumers would be further penalized because utilities would be forced to raise their rates to cover the costs of potentially endless litigation brought by " 'eager lawyers, using the class action vehicle [to] circumvent the state['s] rate-making mechanisms' " *(Wegoland, Ltd. v NYNEX Corp., supra,* 27 F3d, at 22, quoting *Taffet v Southern Co.,* 967 F2d 1483, 1492, *supra).*

## V

█ In any event, the defendants did not conceal their "rounding up" policy. Indeed, the PSC's rate-approving procedures and the resulting tariffs are matters of public record, so that the consumers' "knowledge of the lawful rate is conclusively presumed" *(Kansas S. Ry. v Carl,* 227 US 639, 653; *see also, Maislin Indus. v Primary Steel,* 497 US 116, 127, n 9, *supra;*

*Nader v Allegheny Airlines,* 426 US 290, 306, n 14; *Pittsburgh Ry. Co. v Fink,* 250 US 577, 581; *Marco Supply Co. v AT & T Communications,* 875 F2d 434, 436, *supra; Aero Trucking v Regal Tube Co., supra,* at 622; *Marcus v AT & T Corp.,* 938 F Supp 1158, 1169, *supra; Gelb v American Tel. & Tel. Co.,* 813 F Supp 1022, 1030, *supra).* This is no idle presumption in the instant case, as the record reveals that the defendants' billing practices were fully aired, *inter alia,* at various public rate-setting hearings. Besides, no reasonable consumer would have been deceived into believing that he was being billed by the second, when his monthly statements contained no charges for calls of less than a full minute, and when common sense told him that a call of less than one minute was not free *(see, e.g., Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank,* 85 NY2d 20, 26; *Gershon v Hertz Corp.,* 215 AD2d 202).

Finally, any "harm" allegedly suffered by the plaintiff is illusory *(see, Keogh v Chicago & Northwestern Ry.,* 260 US 156, 164-165, *supra),* because he has merely paid the filed tariff rate that he was required to pay. "[A]ny subscriber who pays the filed rate has suffered no legally cognizable injury" *(Marcus v AT & T Corp., supra,* at 1170). In the absence of injury, the plaintiff cannot sue for damages, nor may he seek equitable redress, "because there is nothing to redress" *(Marcus v AT & T Corp., supra,* at 1172).

To summarize: all of the plaintiff's common-law claims must be dismissed because they are barred by the Public Service Law, which gives the PSC the exclusive authority to determine intrastate telephone rates *(see, e.g., Purcell v New York Cent. R. R. Co.,* 268 NY 164, *supra).*

The filed rate doctrine additionally forbids such collateral attacks on the PSC's rate determinations as the instant General Business Law §§ 349 and 350 causes of action. Moreover, there is no violation of General Business Law § 349 if the challenged conduct is in compliance with the rules and regulations of a *Federal* commission (General Business Law § 349 [d]); and the FCC expressly declared in 1993 that telephone billing on a per-minute rather than a per-second basis is consistent with its guidelines. There is no "fraud" exception to the filed rate doctrine, whether the alleged fraud be perpetrated on the regulatory agency or directly on consumers. Furthermore, there can be no "unjust enrichment" where a consumer has paid the filed rate.

Since the defendants' tariffs were at all times a matter of public record and were in no way concealed, there is no

underpinning for any cause of action for fraud, deception, misrepresentation, false advertising, violations of the Public Service Law, or breach of a duty of good faith and fair dealing.

■ Finally, injunctive relief is not warranted because the plaintiff has not demonstrated that he is in imminent danger of suffering irreparable harm for which legal remedies are inadequate if the defendants do not more conspicuously advertise their "rounding up" practice. In addition, the courts are not equipped to dictate or police how the defendants advertise their charges. The Legislature has expressly assigned these tasks to the PSC.

Accordingly, the order is reversed insofar as appealed from, on the law, those branches of the defendants' motion which were to dismiss the first, second, fourth, fifth, sixth, and seventh causes of action in the complaint with prejudice are granted, and the order is affirmed insofar as cross-appealed from.

ROSENBLATT, J. P., SULLIVAN and PIZZUTO, JJ., concur.

Ordered that the order is reversed insofar as appealed from, on the law, and those branches of the defendants' motion which were to dismiss the first, second, fourth, fifth, sixth, and seventh causes of action in the complaint with prejudice are granted; and it is further,

Ordered that the order is affirmed insofar as cross-appealed from; and it is further,

Ordered that the defendants are awarded one bill of costs.